75 So.2d 159

**Phillip U. USHER**

**v.**

**DEPARTMENT OF INDUSTRIAL RELATIONS.**

**6 Div. 380.**

Court of Appeals of Alabama.

Nov. 11, 1952.

Rehearing Denied Dec. 9, 1952.

Reversed on Mandate Oct. 19, 1954.

Lange, Simpson, Robinson & Somerville, Birmingham, for appellant.

White, Bradley, Arant, All & Rose, Burr, McKamy, Moore & Tate and Martin, Turner, Blakey & Bouldin, all of Birmingham, amici curiæ.

CARR, Presiding Judge:

This is an appeal by the claimant, Phillip U. Usher, from a judgment denying to him unemployment compensation.

In the court below the trial judge made a special finding of facts as follows:

"The Court, of course, finds to be true those statements of fact contained in the stipulation between the parties which, in due course, should appear on the several pages at the beginning of the testimony in the cause, and also that stipulation between the parties which should, in due course, appear near the close of the testimony of the witness, Bob Rogers. The Court further finds from the testimony in the case that the United Steel Workers of America, affiliated with the C. I. O., was the bargaining agent, during all times involved in these cases, for and in behalf of Local Unions Numbers 3662, 1733 and 2210. The number of employees of the Tennessee Coal, Iron & Railroad Company who were in the Railroad Transportation Department, who were members of these three unions and the number who were not members are shown in one of the stipulations. As further shown by the first stipulation, as it will appear in the transcript, there were other em-

J. Eugene Foster and O. J. Goodwyn, Montgomery, for appellee.

ployees of this Company in the Railroad Transportation Department, who were members of other unions not connected with or associated with United Steel Workers of America and C. I. O. Moreover, there were still other employees, as shown in the said stipulation, who were not members of any union. In addition, there were other local unions of the United Steel Workers of America whose members were employees of the Tennessee Coal, Iron & Railroad Company and engaged in various phases of the Company's manufacturing processes. The contracts between the Tennessee Coal, Iron & Railroad Company on the one hand and the United Steel Workers of America on the other hand, having to do with the terms and conditions of employment of the members of these several unions, that is, the unions which were local unions of United Steel Workers of America, affiliated with the C. I. O., expired on July 15, 1949. Negotiations had been in progress for thirty days before that time in an effort to work out the terms of a new contract. These negotiations failed and a strike had been called for July 15, 1949. This strike was deferred for sixty days, probably at the request of the President of the United States, and was again deferred another fifteen days and was finally fixed for the time and date of 12:01 A.M., on October 1st, 1949. All efforts to reach an agreement failed, and on September 30, 1949, the Tennessee Coal, Iron & Railroad Company was actively arranging its affairs in anticipation of what appeared to be an inevitable strike, beginning at midnight of that night. It mined no further iron ore after 7:00 A.M. of that morning. During the day of September 30th and night of that same date, its furnaces were being banked, its properties were being made secure, and notices were being given to the employees on the general subject of the closing of operations beginning on October 1st, 1949. The notices that went out to the workers in the Railroad Transportation Department were given, as appears to have been a regular thing in that Department, in this general type of language: 'Your job is abolished,' or 'All jobs are abolished.' The claimant, Usher, was given notice about the middle of the afternoon of September 30, 1949, to the general effect that his job had been abolished. Usher was a member of the Brotherhood of Locomotive Firemen and Enginemen, not a C. I. O. Union, and not affiliated with United Steel Workers of America. There was no controversy at that time between the Tennessee Coal, Iron & Railroad Company and Usher or his union with respect to wages or other terms of employment. Neither Usher nor his Union called any strike, nor did he or his Union take part in any strike on that occasion. The claimant, Ross, was not a member of any union at the time in question. He was notified of abolishment of runs in the Railroad Transportation Department of the Company at 10:30 A.M. on October 1st after the strike began at 12:01 A.M. of that same date—the notification being about ten and a half hours after the strike began. There was no controversy between Ross and the defendant about wages or any other terms of conditions of employment. There was no controversy between him and his employer of any sort or kind. There was no labor dispute as between him on the one hand and his employer on the other hand. Both Ross and Usher on the date of September 30, 1949, and October 1st, 1949, were railroad engineers.

"The strike of the several unions affiliated with the United Steel Workers of America and C. I. O. occurred as scheduled at 12:01 A.M., October 1st, 1949, and the strike was not settled until November 13, 1949, The Tennessee Coal, Iron & Railroad Company did not attempt to operate during the strike and substantially all of its employees were out of work during that period with the exception of certain employees whom the striking unions had agreed should not be affected, such as would be reasonably required for preserving the property and for performing similar or related work. At the conclusion of the strike, in reasonably short time, operations were resumed and the men, including these two claimants, returned to work.

"The testimony shows that for the last ten years at least, the Tennessee Coal, Iron

& Railroad Company, where strikes of this kind have occurred, has not attempted to continue its operations and to induce employees to cross picket lines. The evidence shows in this particular instance that there were picket lines at the three gates in Ensley, which were the entrances to the Transportation Department and other departments as well, beginning at the time of the strike, and lasting throughout the strike.

"This Court is reasonably satisfied from the evidence that the closing of the Railroad Transportation Department of the Company was indubitably caused by the strike. It was in this Department that each of these two claimants was employed. The closing of this particular department began during the afternoon prior to the midnight at which the strike became effective, but there was then in being a labor dispute between the Company and a large number of its employees, and this dispute culminated in the strike referred to hereinabove.

"Under modern conditions with respect to unionism and the feeling of workers generally on the subject of crossing picket lines, and in doing other things which would tend to break a strike, and taking into consideration the number of men in the Railroad Transportation Department who were members of the unions which initiated the strike and prosecuted it, the Court is reasonably satisfied and finds as a fact that it would not have been practical or reasonable that the Company should have attempted to continue its operations. Under all the circumstances and conditions the Court is reasonably satisfied that it was not feasible or practical, or wise that the Company should attempt further to operate its Railroad Transportation Department after the beginning of the strike."

Our approach to a review of this factual finding is controlled by well-established rules. Department of Industrial Relations v. Tomlinson, 251 Ala. 144, 36 So.2d 496; Alabama Mills, Inc. v. Brand, 251 Ala. 643, 36 So.2d 574.

The applicable law first appeared in the General Acts of Alabama of 1935, pp. 957–958, in this verbiage:

"Section 6. Benefits Eligibility Conditions. * * * (d) During Trade Disputes. An employee shall not be eligible for benefits for any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed."

This section was based on a comparable provision in the unemployment compensation law of Wisconsin, the only state to adopt an unemployment compensation law prior to our state.

The original draft of the act did not attempt nor purport to define the term "labor dispute" as it appeared in the above section.

The legislature, by Act No. 497, General Acts of 1939, p. 721, amended the pertinent law by defining a "labor dispute." The amended section is as follows:

"Disqualification for benefits.—An individual shall be disqualified for benefits for total or partial unemployment:—

"A. For any week in which his total or partial unemployment is directly due to a labor dispute still in active progress in the establishment in which he is or was last employed; for the purposes of this section only, the term 'labor dispute' includes any controversy concerning terms, tenure or conditions of employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment, regardless of whether the disputants stand in the proximate relation of employer and employee. This definition shall not relate to a dispute between an individual worker and his employer." Title 26, § 214, subd. A.

It should be noted that the term "an employee", as it appeared in the original draft, was changed by the amendment to "an individual."

There has been no subsequent amendment to the 1939 act.

The indicated definition of a "labor dispute" is in the same language as it is found in the Norris-LaGuardia Act of Congress, 29 U.S.C.A. § 113(c), except that the word "tenure", appearing in our state statute, is not in the act of Congress, but our law contains the exact verbiage of the definition as is found in the National Labor Relations Act, 29 U.S.C.A. § 152(9).

Before the effective date of the indicated amendment the case of Department of Industrial Relations v. Drummond, 30 Ala. App. 78, 1 So.2d 395, arose. Justice Simpson, then a member of this court, authored the opinion. Judge Rice concurred specially, and Presiding Judge Bricken dissented.

The effect of the majority view was that the claimant was entitled to unemployment compensation because his unemployment was not directly due to the strike, but was caused by a lockout enforced by his employer. Judge Rice confined his concurrence to this specific inquiry. Judge Simpson responded to another question and wrote somewhat at length to this response. He held that the act did not contemplate that a claimant should be denied the benefits of the law because of a labor dispute in which he was in no way involved.

In an extended opinion on rehearing the court did not depart from this view, but anchored its conclusion specifically on the position that the unemployment was not directly due to a labor dispute but to the lockout.

On certiorari, 241 Ala. 142, 1 So.2d 402, the Supreme Court denied the writ by stating:

"Upon consideration of this cause the conclusion is reached that the majority opinion of the Court of Appeals written by Judge Simpson correctly interprets the Act in question, Gen.Acts 1935, p. 950, as applicable to the facts therein stated, and that no further discussion is here necessary."

We think that in its final analysis the view expressed in the Drummond case by Judge Simpson relating to the matter of instant concern was in the nature of dictum. The other question was stressed by the majority opinion and was decisive of the appeal.

The opinion of the Supreme Court on certiorari does not specifically declare an affirmance of and concurrence in both of Judge Simpson's views.

It may be noted that one of the authorities upon which Judge Simpson relied is the case of Kieckhefer Container Co. v. Unemployment Compensation Commission, 125 N.J.L. 52, 13 A.2d 646. In respect to this opinion the Court of Appeals of Georgia had this to say:

"This ruling of the New Jersey court seems to be at variance with the general acceptance of the meaning of 'directly interested' in the labor dispute by various labor boards and other tribunals, cited above in this opinion." Huiet, Com'r of Dept. of Labor v. Boyd, 64 Ga.App. 564, 13 S.E.2d 863, 867.

In Badgett v. Department of Industrial Relations, 30 Ala.App. 457, 10 So.2d 872, 873, Presiding Judge Bricken stated the facts as follows:

"The record in this case discloses that the appellant and her Union voted for the closed shop agreement with the management of Utica Knitting Mills. The appellant's Union passed out cards in the Mill, following the execution of the closed shop contract, to all workers who were non-members of appellant's Union, informing them that each would have to pay dues of $1.00 per month to the C. I. O., whether they wanted to or not. The purpose or intention of the closed shop contract was to exclude all persons from employment at the Mill who failed or refused to pay the $1.00 a month dues to the C. I. O. It is clear that the C. I. O. and the management were under the impression that they had a right to enter into a contract of that kind, and that the C. I. O. was insisting on its enforcement to the letter. It was endeavoring to rid the

Mill of every employee who would not contribute $1.00 per month to its treasury, and to bar every one from employment at the Mill until the monthly dues were paid.

"It is likewise convincingly clear that the appellant voted for this arrangement, and that her bargaining agent was insisting upon full compliance with the contract on the part of the management, with her knowledge and approval.

"In such circumstances, it is difficult for us to reach the conclusion that appellant was unemployed *through no fault of her own*."

On the basis of this factual foundation the majority members of this court held that the claimant was not entitled to unemployment benefits.

Judge Simpson expressed the view that the question of concern was controlled by the holding in Department of Industrial Relations v. Pesnell, 29 Ala.App. 528, 199 So. 720, and that the principles pronounced in the Drummond case were inapplicable.

On certiorari, Badgett v. Dep't of Ind. Relations, 243 Ala. 538, 10 So.2d 880, and on rehearing the majority members of the Supreme Court denied the writ, but expressly failed to concur in Judge Simpson's view relating to the authoritative effect and influence of the Pesnell and Drummond cases.

In the fairly recent case of Tennessee Coal, Iron & R. Co. v. Martin, 33 Ala.App. 502, 36 So.2d 535, we again reviewed the matter of the rights of a claimant under the provisions of the statute of instant concern.

We responded to two questions. (1) Did the unemployment result directly from a labor dispute? (2) Was the labor dispute still in active progress in the establishment in which the claimant was last employed? We answered the first inquiry in the affirmative and the second in the negative.

On certiorari, 251 Ala. 153, 36 So.2d 547, the Supreme Court "left to one side" our holding that the unemployment was due to a labor dispute.

The conclusion is inescapable that if our holding in the Martin case is to be reaffirmed, the judgment below in the case at bar must be sustained. An examination of the facts in the Martin case will illustrate this view.

Judge Harwood authored the opinion in the Martin case. He reasoned that the 1939 amendment defining a labor dispute lifted the inquiry from the influence of the Drummond case.

It is urged in the case at bar that the amendment did not have this effect, since it only attempts to define the significance and meaning of the term "labor dispute."

We do not think that our decision in the instant case must necessarily depend on the soundness or unsoundness of Judge Harwood's conclusion.

As we have undertaken to illustrate, we do not think that the dictum in the Drummond case is binding on this court. Title 13, § 95, Code 1940.

An examination of the pertinent statutes in the various states will disclose that in many jurisdictions the law provides in effect that ineligibility for unemployment benefits shall not prevail if the claimant was not participating in, or financing, or directly interested in the labor dispute.

Despite the dissimilarity in the language of the law, the rationale and reasoning of many of the authorities in other jurisdictions impel the view that our holding in the Martin case is sound. We will cite some of these: Lauf v. E. G. Shinner & Co., 303 U.S. 323, 58 S.Ct. 578, 82 L.Ed. 872; New Negro Alliance v. Sanitary Grocery Co., 303 U.S. 552, 58 S.Ct. 703, 82 L.Ed. 1012; Blankenship v. Kurfman, 7 Cir., 96 F.2d 450; Grace Co. v. Williams, 8 Cir., 96 F.2d 478; International Brotherhood of Teamsters, Chauffeurs, Stablemen and Helpers v. International Union of United Brewery, Flour, Cereal and Soft Drink Workers of America, 9 Cir., 106 F. 2d 871; Houston & North Texas Motor

Freight Lines, Inc. v. Local Union No. 886 of International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America, D.C., 24 F.Supp. 619; Rohde v. Dighton, D.C., 27 F.Supp. 149; Matson Nav. Co. v. Seafarers International Union of North America, D.C., 100 F.Supp. 730; Denver Local Union No. 13 of International Brotherhood of Teamsters, Chauffeurs, Stablemen, and Helpers of America v. Perry Truck Lines, Inc., 106 Colo. 25, 101 P.2d 436; Marvel Baking Co. v. Teamsters' Union Local No. 524, 5 Wash.2d 346, 105 P.2d 46; Lichterman v. Laundry & Dry Cleaning Drivers Union Local No. 131, 204 Minn. 75, 282 N.W. 689, 283 N.W. 752; Huiet, Com'r of Dept. of Labor v. Boyd, supra; Johnson v. Pratt, 200 S.C. 315, 20 S.E.2d 865; Appeals by Employees of Polson Lumber & Shingle Mills, 19 Wash.2d 467, 143 P.2d 316; Nobes v. Michigan Unemployment Compensation Commission, 313 Mich. 472, 21 N.W.2d 820; Auker v. Review Board, Indiana Employment Security Division, 117 Ind.App. 486, 70 N.E.2d 29, 71 N.E.2d 629; Copen v. Hix, 130 W.Va. 343, 43 S.E.2d 382.

Our statute does not contain any qualification or explanation of the term "directly due." We must, therefore, conclude that the legislative intent is expressed in the unqualified and unambiguous language of the act.

■ Under the guise or pretense of judicial construction or interpretation the courts have no authority or right to redraft the law. State ex rel. Robertson v. McGough, 118 Ala. 159, 24 So. 395; State v. Praetorians, 226 Ala. 259, 146 So. 411; State v. Tuscaloosa Bldg. & Loan Ass'n, 230 Ala. 476, 161 So. 530, 99 A.L.R. 1019; Department of Industrial Relations v. Little Mfg. Co., 253 Ala. 416, 44 So.2d 587.

■ In construing statutes, unless the law stipulates to the contrary, the courts are required to give contained words and terms their natural and commonly understood meaning.

■ "Directly" is defined as "In a direct manner; in a straight line; without deviation of course; straight." "Due", in the sense used in the act, means "Owing or attributable (to something); ascribable, as to a cause." Websters New International Dictionary, 2nd Edition.

■ The term "directly due", as it appears in the statute of instant concern, is in many respects comparable in meaning to the familiar expression "proximate cause." That is to say, the unemployment is "directly due" to a labor dispute if the dispute in fact exists and the unemployment follows as the immediate, expected, efficient, natural, and probable consequence, without the intervention of a new and independent cause.

■ In the case at bar, unquestionably there was a labor dispute within the contemplation of the provisions of the applicable law. The unemployment of the claimant was caused by the work stoppage incident to the existing disagreements. The conclusion is inescapable that it was directly due to the labor dispute.

It may be surmised with some force and persuasion that our interpretation will result in unfairness to the instant claimant and to others who may be similarly situated. Should this be conceded, we are still faced with the task and duty to refrain from usurping the exclusive prerogative of the legislature. To depart from this well-defined path would violate the fundamental juristic principles of our authorized procedure.

The industrial life of our country has reached great proportions. With its growth have arisen many intricate problems and approaches.

All persons whose labor is engaged in an industrial establishment are in a class or group akin to partners in a venture. This mutual dependency is always vital and essential to regular and continued employment and production. The stoppage of labor by a group in one class or department necessarily restrains or restricts the work of employees in other groups.

When the matter of employment and unemployment relationships is viewed in this

broad perspective, it cannot be said that unfairness results by the enforcement of our statute in its unambiguous form.

We think that the conclusions reached in the Martin case, supra, are in accord with the plain language of the law.

The judgment below is ordered affirmed.

Affirmed.

PER CURIAM.

Reversed and remanded on authority of Usher v. Department of Industrial Relations, 261 Ala. 509, 75 So.2d 165.